CONNELLY
LAW OFFICES

John B. McEntire, IV, Wash. Bar No. 39469
Colin Prince, Wash. Bar No. 43166
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100
Attorneys for Plaintiff A.L.
Appearing *Pro Hac Vice*

Davina Chen
Law Office of Davina Chen
1751 Colorado Blvd, No. 190
Los Angeles, California 90041
213.446.8791
Attorney for Plaintiff A.L.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.L.,<br><br>      Plaintiff,<br><br>  v.<br><br>United States of America; Darrell Wayne Smith; and Ray J. Garcia,<br><br>      Defendants. | No. 4:24-cv-6580-YGR<br><br>First Amended Complaint<br><br>Demand for Jury Trial |

**Table of Contents**

I.  Introduction ..........................................................................................................4

II.  Jurisdiction ..........................................................................................................6

III.  Divisional Assignment .......................................................................................7

IV.  Parties ..................................................................................................................7

V.  Facts ....................................................................................................................7

   A.  "The Rape Club." ...................................................................................7

   B.  A.L. discovers there is no protection. ....................................................9

      1.  A.L. files written grievances protesting sexually degrading treatment, and BOP staff threaten her and then retaliate when she refuses to stay quiet. ..9

      2.  BOP cuts off other avenues for A.L. to report the abuse. .........................11

   C.  A.L. is forcibly assaulted by Officer Darrell "Dirty Dick" Smith. ........................11

   D.  A.L. is forced to endure sexual abuse from Warden Garcia to avoid further sexual assaults by Officer Smith. ................................................................. 12

   E.  A.L. is forced to endure other forms of sexual abuse, harassment, and retaliation. ........................................................................................................... 14

      1.  A.L. is sexually abused and harassed while working. ................................ 14

      2.  A.L.'s unit manager takes her underwear. ................................................. 14

      3.  A.L. is threatened with loss of property. ...................................................15

      4.  A.L. watches BOP staff terrorize others. ...................................................15

   F.  A.L. is transferred to Minnesota, where the retaliation continues. .......................15

   G.  BOP instilled terror and hopelessness, causing lasting damage. ..........................16

   H.  PREA "doesn't really exist in Dublin." ............................................................. 16

      1.  On paper, BOP investigates all allegations of sexual harassment. ............. 16

      2.  In practice, BOP rarely investigates and, when it does, it undermines all investigations by refusing to credit victim testimony. ............................... 18

      3.  On paper, BOP requires staff to report suspected sexual abuse and protect inmates from retaliation. ............................................................. 21

      4.  In practice, BOP staff fail to report sexual abuse, and they openly retaliate

against victims. ........................................................................................ 23

      5.     On paper, BOP espouses a "zero tolerance" policy for sexual abuse. ....... 24

      6.     In practice, BOP tolerates widespread sexual abuse and harassment. ...... 25

   I.     BOP retaliates after A.L. files suit and speaks to newspaper reporter. ................. 27

VI.   Exhaustion ........................................................................................................ 30

VII.  Claims ............................................................................................................... 30

   A.    First Claim: Sexual Assault and Sexual Battery ...................................... 31

   B.    Second Claim: Assault and Battery ........................................................ 31

   C.    Third Claim: Intentional Infliction of Emotional Distress ................................... 32

   D.    Fourth Claim: False Imprisonment ....................................................... 32

   E.    Fifth Claim: Sexual Harassment ........................................................... 33

   F.    Sixth Claim: Intentional Interference with Civil Rights by Threats, Intimidation, or Coercion ........................................................................................ 33

   G.    Seventh Claim: Invasion of Privacy ...................................................... 34

   H.    Eighth Claim: Negligence ..................................................................... 35

   I.    Ninth Claim: Sex Trafficking ................................................................ 37

   J.    Tenth Claim: Obstruction ..................................................................... 38

   K.    Eleventh Claim: Conspiracy to Sex Traffick ......................................... 39

   L.    Twelfth Claim: Cruel and Unusual Punishment ................................... 39

VIII. Jury Demand ................................................................................................... 40

IX.   Relief Requested .............................................................................................. 40

*It is unconscionable that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin.*

~ Wendy Still, Special Master for FCI Dublin

## I.      Introduction

In February 2019, A.L. was sentenced in Eastern Washington for a non-violent drug charge. The sentencing stood out for its positive tone, with Judge Peterson commenting that A.L.'s turnaround story made her "a superstar, an absolute superstar."

Those comments were warranted. As a child, A.L. had been the victim of repeated sexual abuse, sometimes so brutal it required stitches. She was abandoned to foster homes and juvenile detention facilities and turned to stealing food and clothing to help care for her sister. The trauma led to addiction and the crimes that come with addiction.

But before sentencing, A.L. turned an extraordinary corner: she completed extensive drug treatment, earned union certifications in welding and carpentry, accepted a position as a construction supervisor for a state-correctional construction program, and earned a college scholarship—all while in pretrial custody.

A.L.'s rehabilitation wasn't the only unusual aspect at her sentencing. A former Washington state prosecutor (who had personally prosecuted A.L. on several occasions) flew from his retirement home in Florida to Spokane to testify in A.L.'s favor—at his own expense and on his own initiative. "She's a good person," he told the court, sharing that "she has a lot of empathy" and the capacity to "do almost anything she sets herself out to do, unless something catastrophic [happens] and the walls cave in, as they often have in her life."

The district court agreed. Judge Peterson stated A.L.'s criminal history stemmed from past abuse, recognizing A.L. became "a perpetrator" largely "because you were the victim."

The district judge highlighted the obvious reason A.L. was able to take control of her life: "You were in a safe environment." Judge Peterson emphasized the importance of safe custody: "You were in a place where you didn't have to worry about clothing or housing . . . where you

First Amended Complaint                            – 4 –                        **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

could use your skills of leadership and empower yourself and then empower other people." "[Y]ou're trying to break the cycle," the judge said. If A.L. didn't succeed, the judge noted, then the future "is just more victimization all the way around."

The sentencing ended on hopeful notes, with the judge recommending release programs to give A.L. a "safe place" and a "great platform" to continue building a new life. "This is all intended to empower you, to help you on the road to recovery"—"I'm confident you're not going to let the past defeat you."

A.L. left her federal sentencing thankful for Judge Peterson's support and hoping for the precise environment the judge described: A safe place. A safe environment. A place to leave past victimization behind. Instead, the walls again caved in.

The federal government sent A.L. to FCI Dublin. The facility was run by government-funded sex predators—guards, cooks, staff, even the warden and chaplain—who leveraged their absolute power to rape, molest, and intimidate the women now trapped within Dublin's walls. Sexual abuse was not only widespread at Dublin, but also out in the open.

BOP staff leveraged their power to abuse A.L., just as they had done to dozens of other women. As detailed below, from the moment she arrived at FCI Dublin, A.L. was subject to sexual predation: guards peering at her in the shower and on the toilet; catcalling; groping; and threats. When she refused repeated advances from a guard, Darrel "Dirty Dick" Smith, he pinned her to a concrete cell wall and digitally penetrated her.[1]

A.L. pleaded for help. She wrote formal grievances. She told her unit manager. She told BOP staff. She wrote to the Department of Justice's Office of Inspector General.

While A.L's pleas for help went unanswered outside the facility, she received a swift response from inside: threats. Guards told her they would make life "difficult" if she continued

---

[1] He is so widely called "Dirty Dick Smith" that he was indicted under that moniker. *See U.S. v. Smith*, No. 23-cr-110-YGR (N.D. Cal. 2023) (indicting "Darrell Wayne Smith, also known as Dirty Dick Smith").

to complain. Her unit manager threatened solitary confinement. One guard punished A.L. by forcing her to kill baby goslings hatching in the prison yard. He watched as she cried.

As A.L. and numerous other women were being sexually assaulted and harassed, BOP published a self-congratulatory report declaring that, in 2021, across 30,000 employees and 150,000 incarcerated people, the agency found not one substantiated claim of staff-on-inmate sexual misconduct anywhere in the nation—including at FCI Dublin.[2] A thorough investigation indeed.

A.L. has been released from custody and is now in counseling to care for the mental scars FCI Dublin left—scars she'll carry the rest of her life. This lawsuit seeks to deliver some measure of justice to A.L. and redress the injuries and indignities inflicted by the very people charged with keeping her safe.

## II.    Jurisdiction

2.1    A.L.'s claims can be loosely grouped into two categories: claims against the United States under the Federal Tort Claims Act (FTCA); and claims against individual defendants under the federal Constitution and certain federal statutes.

2.2    Under the first category, the FTCA provides subject matter jurisdiction for torts committed by federal employees.[3]

2.3    Under the second category, the Court holds federal-question jurisdiction because the claims arise under the federal Constitution and federal statutes.[4]

2.4    This Court holds personal jurisdiction because the torts occurred at FCI Dublin, located in the Northern District of California.[5]

---

[2] Bur. of Prisons, *Annual PREA Report, Calendar Year 2021* (Mar. 30, 2022) (PREA Report).
[3] *See* 28 U.S.C. §§ 1346(b)(1) (granting district courts "jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").
[4] *See* 28 U.S.C. § 1331(a).
[5] *See* 28 U.S.C. § 1391(b)(2) and § 1402(b).

First Amended Complaint                – 6 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

### III.   Divisional Assignment

3.1    Under Local Civil Rule 3–5(b) and the assignment plan created by General Order 44, the appropriate division is Oakland, as the primary events occurred in Alameda County.

### IV.   Parties

4.1    During the events described below, A.L. was in the care of the Federal Bureau of Prisons, housed at FCI Dublin in the Northern District of California.

4.2    The United States has waived sovereign immunity under the Federal Tort Claims Act, and the federal Bureau of Prisons is a "Federal agency" under the statute,[6] and thus liable for the claims described below.

4.3    Ray J. Garcia was warden at FCI Dublin from 2018 to approximately July 2021, making him an "employee of the government" under the FTCA.[7] In this suit, claims are brought against Mr. Garcia in his individual capacity. As the warden, Mr. Garcia was responsible for the supervision, care, control, and safety of the women held at FCI Dublin, including A.L.

4.4    Darrell "Dirty Dick" Smith was a guard at FCI Dublin while A.L. was held there, making him an "employee of the government" under the FTCA. In this suit, claims are brought against Mr. Smith in his individual capacity. As a guard, Mr. Smith was, like the warden, responsible for the supervision, care, control, and safety of the women held at FCI Dublin, including A.L.

### V.   Facts

#### A.   "The Rape Club."

5.1    A.L. arrived at FCI Dublin in early summer 2019. From the moment she arrived, the sexual abuse was constant, a routine fact of everyday life so pervasive at FCI Dublin that prison employees dubbed the facility "The Rape Club."[8]

---

[6] *See* 28 U.S.C. § 2671.

[7] *See* 28 U.S.C. § 2671.

[8] Heather Knight, *Federal Officials to Shut Women's Prison After Years of Sexual Abuse*, N.Y. Times (Apr. 15, 2024) (noting "prison employees call the facility 'the rape club'"); Michael R. Sisak, *Bureau of Prisons to close California women's prison where inmates have been subject to sex*

First Amended Complaint                    – 7 –                    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100



5.2    A.L. immediately understood why. It started with BOP kitchen staff making sexual come-ons, telling A.L. to take a kitchen job so they could engage her in sexual conduct.

5.3    Women warned A.L. about the kitchen, saying BOP staff there were sexually aggressive. It quickly became clear, however, that sexual aggressiveness from BOP staff wasn't confined to the kitchen—it was everywhere. Guards would hit on women or make sexual comments about their bodies. Groping and other forms of sexual assault were commonplace.

5.4    No space was safe. Guards would watch women use the toilet—not for security but gawking for sexual gratification. The same was true in the showers—guards would open the curtains and watch women bathe.

5.5    A.L. suffered through this predatory behavior routinely.

5.6    FCI Dublin was precisely the opposite of the "safe environment" Judge Peterson envisioned at sentencing.

*abuse*, PBS News (Apr. 15, 2024) ("The federal Bureau of Prisons said Monday it is planning to close a women's prison in California known as the "rape club" despite attempts to reform the troubled facility . . . .").

First Amended Complaint         – 8 –         **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**B.      A.L. discovers there is no protection.**

5.7      As A.L. would soon learn, there were no means for reporting sexual misconduct, and any attempts to do so were swiftly punished.

**1.      A.L. files written grievances protesting sexually degrading treatment, and BOP staff threaten her and then retaliate when she refuses to stay quiet.**

5.8      After watching and suffering through several sexually degrading events, A.L. submitted a written grievance to Ms. Mulligan, A.L.'s unit manager, the person charged with assisting the women.

5.9      The response was chilling. Instead of providing support and protection, Mulligan weaponized the grievance process by sharing A.L.'s plea for help with the perpetrators themselves—the very guards A.L. reported. Shortly after A.L. filed her first grievance,[9] multiple guards, including three in particular, Saucedo, Ramos, and Silva, stopped by A.L.'s cell asking why she was "snitching" and "kicking up dust." Silva told A.L. that he would "make time hard on her" if she continued to complain about the abuse.

5.10      To drive home their absolute grip on her life, they quoted language from A.L.'s grievance back to her. The point was clear: they controlled BOP's official channels—she couldn't seek help without them knowing.

5.11      Mulligan did more than pass along A.L.'s grievance to the perpetrators; she also threatened A.L. for reporting. Mulligan told A.L. if she filed further grievances, she'd be placed in the SHU—solitary confinement—while her claims were "under investigation." And, as Mulligan told A.L., that process could last "the rest of the time you're here"—i.e., years. A.L. knew she meant it: to speak up was to be locked away in isolation for years, losing all access to the outside world.

---

[9] A.L. submitted multiple grievances about sexual abuse and harassment while at FCI Dublin.

First Amended Complaint                    – 9 –                    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.12    Mulligan also knew A.L., like all women at FCI Dublin, were vulnerable to threats, intimidation, and emotional abuse. If thrown into the SHU, A.L. would lose valuable privileges: the ability to socialize, call family, attend rehabilitation classes, good-time credit, and First Step Act credits. She would also lose money—A.L. would be unable to work while in solitary confinement.

5.13    The gravity of Mulligan's threat cannot be overstated. Extended solitary confinement is, quite literally, torture.[10] Mulligan's threat, if executed, would inflict a horrific punishment, as numerous judges have observed: "Prolonged solitary confinement is one of the true horrors of the modern-day penal system,"[11] because "near-total isolation exact[s] a terrible price"[12] on the victim. The late-Senator John McCain, himself the victim of prolonged solitary confinement, called the practice "an awful thing" that "crushes your spirit and weakens your resistance more effectively than any other form of mistreatment."[13] Extended solitary confinement can cause lifelong mental damage.

5.14    In short, Mulligan threatened to have A.L. tortured through solitary confinement as retaliation for reporting BOP staff's criminal conduct.

5.15    Despite threats from Mulligan and the guards, A.L. continued to voice complaints about the sexual abuse and harassment. This time, BOP staff responded with action. For example, Saucedo took A.L. into FCI Dublin's yard, where geese were nesting, and forced A.L. to kill baby goslings, watching with satisfaction as adult geese savagely attacked. A.L. returned from the yard crying, dirty, and wounded—only to be forced to do it again. And again.

---

[10] The United Nations Rapporteur on Torture agrees. In 2011, the United Nations declared that "solitary confinement in excess of 15 days should be subject to an absolute prohibition." United Nations News, *Solitary confinement should be banned in most cases*, UN expert says (Oct. 18, 2011) (UN News).

[11] *Gallina v. Wilkinson*, 988 F.3d 137, 148 (2d Cir. 2021) (Pooler, J., dissenting).

[12] *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

[13] Richard Kozar, John McCain: Overcoming Adversity at 53 (Chelsea House 2001).

First Amended Complaint                – 10 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.16    Saucedo never hid the reason for his sadistic behavior: A.L.'s continued "snitching." Indeed, he said as much, telling A.L., "this is what happens when you run your mouth" (or words nearly identical).

5.17    A.L. soon realized there was no way out by reporting the problems to BOP.

**2.    BOP cuts off other avenues for A.L. to report the abuse.**

5.18    Unable to report abuse through BOP's grievance process, A.L. next reported the abuse to family. BOP's response was even more chilling. For example, shortly after A.L. told a family member during a call about the constant abuse, a guard named Padilla went to A.L.'s cell and ordered her to stop talking about the guards' misconduct on the phone.

5.19    The same was true with video visits. More than one video visit with her family would "cut off" moments after A.L. raised BOP staff's sexual misconduct.

5.20    Again, the message was clear: the guards were literally monitoring efforts by the women to report abuse outside the prison walls.

5.21    No matter how A.L. tried to report the abuse she and others were experiencing, BOP employees swiftly silenced her.

**C.    A.L. is forcibly assaulted by Officer Darrell "Dirty Dick" Smith.**

5.22    From approximately November 2019 to February 2020, A.L. was targeted and then sexually attacked by Officer Darrell Wayne Smith. It began with Smith repeatedly opening the bathroom door while A.L. was using the toilet so he could watch, and it continued with Smith repeatedly opening the curtain and watching while A.L. was showering. During these incidents and others, Smith would tell A.L. that "she was looking pretty"; that "she had a nice ass"; that he wanted her to "let him see"; and that he wanted to know about the tattoos on A.L.'s body, including those on her breasts and near her groin—tattoos Smith could only see when she was naked.

First Amended Complaint                – 11 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.23   A.L. would push back against his sexual aggression, calling Smith names and telling him to "close her curtain." Smith told A.L. "all the girls were doing it," and that one day "he would get his."

5.24   Smith made good on his threat. In roughly January 2020, Smith came to A.L.'s cell under the pretense of a room search, armed with rubber gloves and a trash bag. He threatened to take A.L.'s property and destroy it, a common coercion tactic used by guards at FCI Dublin. Smith then removed the blue latex gloves he was wearing, physically pinned A.L. to a wall inside the cell with his body, and then pressed his head up against hers.

5.25   While A.L. was pinned against the cell wall, Smith pushed his fingers underneath the elastic waistband on A.L.'s pants and tried to insert his fingers into her vagina—only they were too dry. Smith removed his hand, inserted his fingers in his mouth for lubrication, and then forced his fingers back down her pants and inside her vagina.

5.26   A.L. did not consent and was unable to escape Smith as he restrained her against the concrete wall. While pinned, A.L. could hear Smith moaning and saying things like, "see, it's not that bad"; "what's the matter, you don't like it?"; and "you'll get used to it."

5.27   This continued for what A.L. believes was approximately 10 minutes. When she did not "get used to it," Smith grew frustrated—angry that A.L. wasn't enjoying the digital rape. He released her, threw the gloves on the cell floor, and left.

5.28   Smith's last comment was particularly horrifying and lingered in A.L.'s mind: "you'll get used to it." He intended to *repeat* the assault.

**D.     A.L. is forced to endure sexual abuse from Warden Garcia to avoid further sexual assaults by Officer Smith.**

5.29   A.L. was lost and angry. She was trapped in a federal prison where guards could take everything she owned, put her in solitary confinement, and she now was the target of a sexual predator. She could survive the constant harassment and, to a degree, found purpose in

First Amended Complaint                           – 12 –                           <span>CONNELLY LAW OFFICES</span>
                                                                                    321 W. 8th Avenue
                                                                                    Spokane, Washington 99204
                                                                                    253.593.5100

trying to shield other women from being victimized by the guards. But Smith got to her, leaving her with no good options.

5.30    Her least-worst option was to seek protection from Warden Ray Garcia, so she reported Smith's attack directly to the warden. The Warden neither investigated nor reported Smith's attack on A.L.—an unsurprising result given he too was engaged in extensive sexual crimes.

5.31    Instead, the Warden offered to "protect" A.L. from Smith. He told A.L. that she could work on construction projects inside his office, which would keep Smith away.

5.32    The Warden's protection came with a cost—he regularly found ways to grope her. While A.L. was working on ladders (a common occurrence when doing drywall), the Warden would put his hands on her legs and between her legs, touching her vagina through her clothing. He also grabbed her buttocks. (The behavior was repeated so often that A.L. began avoiding the ladder in his presence.)

5.33    The Warden would find ways to rub his crotch against A.L. or touch her breasts. He would make sexually harassing comments, asking if her breasts were real or fake; he would tell her he wanted to see them (referring to her breasts); or he would instruct her to wear a tighter shirt, as he wanted to "see them boobs," as he put it. The Warden would also tell A.L. to kiss other women, saying "that's what I like to see."

5.34    This behavior occurred on a near-daily basis for months.

5.35    Beyond the groping and comments, the Warden would do A.L. "favors." For example, he gave A.L. preferential job assignments (keeping A.L. out of the abusive kitchen and away from Smith); he would get her coffee from the officer's lounge; allow A.L. to pick her co-workers; and more.

5.36    A.L. understood if the Warden's advances were rebuffed, she would be denied both job assignments and protection from Smith.

First Amended Complaint                    – 13 –                    <span>**Connelly Law Offices**<br>321 W. 8th Avenue<br>Spokane, Washington 99204<br>253.593.5100</span>

5.37    A.L. was forced into a Hobson's choice: endure sexual abuse from the Warden or face aggravated sexual assaults from Smith. The Warden seemed the less-threatening sexual predator, so she was forced to stay in his employ.

5.38    Wardens should not force wards to endure one form of sex abuse to escape another.

**E.    A.L. is forced to endure other forms of sexual abuse, harassment, and retaliation.**

**1.    A.L. is sexually abused and harassed while working.**

5.39    Harassment and retaliation continued in other forms. For example, when A.L. worked one of the holiday meals in the kitchen,[14] two BOP kitchen staff, Chavez and Jones, would brush against her, deliberately pushing their penises against A.L. (as they did to other women). In addition, Jones would rub himself against A.L., and say, for example, "let me see that ass," "you're thick for a white girl," "are you fucking a girl in here? I want to see that"—constant comments of this nature. Like the Warden, Jones would also tell A.L. to kiss other female workers.

**2.    A.L.'s unit manager takes her underwear.**

5.40    In retaliation for continually reporting abuse, A.L.'s unit manager, Ms. Mulligan, took all A.L.'s underwear and bras and kept them locked away for weeks. The point of that bizarre punishment was to leave A.L. *more* vulnerable to the sexual-predator guards. (Needless to say, there is no penological basis to take a person's underwear.)

5.41    A.L. recovered her undergarments only because her counselor, Ms. Barahona, one of the few staff that tried to protect the women from the predatory guards and other staff, got the keys to Mulligan's office, retrieved them, and returned them to A.L.

---

[14] Early in her stay at Dublin, A.L. worked in the kitchen approximately three times during special events before she decided the harassment was so extreme that she stopped working there altogether.

First Amended Complaint                – 14 –                **Connelly Law Offices**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

### 3.    A.L. is threatened with loss of property.

5.42    Throughout her time at FCI Dublin, the guards and staff used the threat of destroying what little worldly property A.L. owned as leverage to keep her quiet. It was routine: *accept the abuse, keep quiet, or we'll destroy the smallest comforts you have.* And they repeatedly, in fact, destroyed her property out of sheer malice.

### 4.    A.L. watches BOP staff terrorize others.

5.43    Daily, A.L. watched other helpless women be sexually assaulted, knowing she might again be next. For example, one of A.L.'s friends, Trina,[15] was sexually assaulted by one of the kitchen staff with a kitchen implement. Trina returned to her cell and showed A.L. the bleeding cut on her vagina.

5.44    A.L. repeatedly watched Smith enter the cells of other women for extended periods, including a Native American woman who was profoundly mentally ill. A.L. tried to intercede when Smith would visit the woman's cell but was unable to report Smith.

5.45    A.L., like everyone, understood there were no consequences. There was no escape. There was no reprieve.

### F.    A.L. is transferred to Minnesota, where the retaliation continues.

5.46    Eventually, A.L. was transferred to FCI Waseca in Minnesota. A.L. understood Mulligan had her transferred because A.L. would not stop complaining about the sexual abuse at FCI Dublin.

5.47    While in Minnesota, A.L. again reported the misconduct at FCI Dublin. Guards told her they weren't interested in hearing about what happened at Dublin—a flat violation of PREA regulation and BOP written policies (but, again, standard practice). A.L. even contacted the Department of Justice's Office of the Inspector General, an agency outside BOP, hoping to convince someone to protect the women remaining at FCI Dublin. No one answered.

---

[15] "Trina" is not the woman's real name. Her initials are "R.C."

First Amended Complaint                    – 15 –                    **Connelly Law Offices**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.48    It was clear by then that *no* arm of BOP was interested in intervening. Fearing additional retaliation, A.L. was forced to wait until she was free from the prison walls before she could speak out.

### G.    BOP instilled terror and hopelessness, causing lasting damage.

5.49    As a result of her experiences in BOP custody, A.L. has been diagnosed with post-traumatic stress disorder (PTSD), severe anxiety disorder, and depression, all of which were either caused or exacerbated by BOP staff. She has been engaged in therapy to cope with the effects.

5.50    A.L. spent her time at FCI Dublin under extreme duress, constantly in fear about what would happen next. That emotional distress stayed with her throughout her time in custody and continues today. She will cope with lifelong effects of the trauma.

### H.    PREA "doesn't really exist in Dublin."

5.51    The Prison Rape Elimination Act (PREA) and its implementing regulations, 28 C.F.R. § 115.11, *et seq.*, govern the protection of incarcerated women, the reporting and investigation of sexual harassment, training staff, preventing retaliation, and disciplining employees. But as one victim testified at the Warden's criminal trial, PREA "really doesn't exist in Dublin."[16]

5.52    That was true. Ignoring and discounting reports of sexual assault by prisoners like A.L. was contrary to BOP's on-the-books policies but was simultaneously BOP's usual practice. Indeed, BOP's written policies bore no resemblance to its practices.

#### 1.    On paper, BOP investigates all allegations of sexual harassment.

5.53    BOP regulations require it to investigate all allegations of sexual abuse and harassment—without exception:[17]

---

[16] *U.S. v. Garcia*, No. 21-cr-429-YGR, ECF No. 88 at 19 (N.D. Cal. Nov. 29, 2022).

[17] *See* 28 C.F.R. § 115.71(a); *see also* BOP Program Statement 5324.12 at 43 (June 4, 2015) (BOP Program Statement).



**BOP Sexual Abuse Policy**

**U.S. Department of Justice**
Federal Bureau of Prisons

PROGRAM STATEMENT
OPI:        RSD/PSY
NUMBER:   5324.12
DATE:      June 4, 2015

**Sexually Abusive Behavior Prevention and Intervention Program**

* * *

**INVESTIGATIONS**

**§ 115.71  Criminal and administrative agency investigations.**

**(a) When the agency conducts its own investigations into allegations of sexual abuse and sexual harassment, it shall do so promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports.**

At the conclusion of the investigation, the allegations must be indicated as:

- Substantiated.
- Unsubstantiated (may have occurred, but insufficient evidence to prove).
- Unfounded (evidence proves that this could not have happened).

5.54    Once an allegation is made, BOP staff must report the claim to the warden, who then must notify the regional director and the Office of Internal Affairs.[18] Once notifications are given, investigators must actually investigate: gather evidence, video, DNA, interview the victim, perpetrator, and witnesses, and review prior complaints.[19] And if BOP investigators find allegations are "substantiated" and "appear[] to be criminal," the agency must—without discretion—refer the case for prosecution.[20]

5.55    BOP must promptly, thoroughly, and objectively investigate sexual abuse allegations.

5.56    If BOP fails to do so, sexual abuse against incarcerated persons will continue—and worsen. But BOP's actual practice was nothing like its policy.

---

[18] BOP Program Statement 5324.12 at 44 (June 4, 2015) (BOP Program Statement).
[19] 28 C.F.R. § 28 C.F.R. § 115.71(b)–(c).
[20] 28 C.F.R. § 115.71(h).

First Amended Complaint                    – 17 –                    CONNELLY LAW OFFICES
                                                                      321 W. 8th Avenue
                                                                      Spokane, Washington 99204
                                                                      253.593.5100

**2.    In practice, BOP rarely investigates and, when it does, it undermines all investigations by refusing to credit victim testimony.**

5.57    None of A.L.'s oral complaints or written grievances were investigated; none of the complaints were properly escalated to the regional director or the Office of Internal Affairs. Neither her reports to staff at FCI Waseca nor her written complaint to the Office of the Inspector General were investigated. BOP staff simply ignored the law.

5.58    It was not just A.L. who was ignored. Sexual-abuse complaints at FCI Dublin "were denied arbitrarily" using "boiler-plate" responses and "canned language," "reflect[ing] a dismissive" attitude—so concluded Wendy Still, the court-appointed Special Master regarding FCI Dublin.[21]

5.59    In June 2024, Ms. Still and her team released a 101-page report about FCI Dublin. She concluded many of the deficiencies at FCI Dublin indicated "systemwide issues within the BOP."[22] At FCI Dublin, Ms. Still found that victims "were never interviewed regarding their allegations."[23] Complaints were rejected "based on missed time constraints"—fabricated deadlines that never existed.[24]

5.60    National BOP practices led directly to the sexual abuse and harassment A.L. suffered at FCI Dublin. For example, until at least 2022, BOP undermined virtually all sexual-abuse disciplinary investigations into staff by refusing to credit the testimony of incarcerated women. The sole reason for discrediting the victims: they were incarcerated. That is precisely what a Department of Justice investigation found.[25]

---

[21] *See Calif. Coalition for Women Prisoners, et al. v. U.S. Bur. of Prisons, et al.*, No. 23-cv-4155-YGR (N.D. Cal. 2023); Special Master Wendy Still, *First Report of the Special Master* at 8 (June 5, 2024) (Still Report).

[22] *Id.* at 6.

[23] *Id.* at 9.

[24] *See id.* at 9.

[25] *See generally* Memo. from Michael Horowitz, Office of Inspector General, to Colette S. Peters, Dir., Fed. Bur. of Prisons (Oct. 12, 2022) (DOJ Memo).

First Amended Complaint    – 18 –    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.61    While investigating multiple credible reports of sexual misconduct against a BOP prison employee, DOJ's Office of the Inspector General was alarmed to learn BOP "arbitrarily and unjustifiably dismisses inmate testimony," even if "highly credible," and even if "provided by several inmates."[26] According to a publicly disclosed memorandum, investigators learned of an unwritten practice: "BOP will not rely on inmate testimony" to "take disciplinary actions against BOP employees."[27]

5.62    This was no isolated problem. Word of this "general practice," as DOJ called it, came not from some random facility—it was disclosed by BOP's own Office of Internal Affairs. The very purpose of that office is to investigate sexual-misconduct by BOP staff.[28] And Internal Affairs confirmed its practice—discounting victim testimony—"on multiple occasions."[29] In short, DOJ didn't stumble upon a general pattern. BOP informed investigators of their unofficial policy.

5.63    When incarcerated women like A.L. reported sexual abuse by a guard, BOP would use her statements "solely for investigative lead purposes,"[30] assuming it investigated at all. The only times BOP would deign to believe inmates and use victim testimony to discipline staff was if the testimony was superfluous. To discipline a guard at FCI Dublin for sexual misconduct, for example, BOP demanded that (1) the guard confess; (2) the guard be caught on video; (3) there was somehow "conclusive forensic evidence" of sexual misconduct; or

---

[26] *Id.* at 4.

[27] *Id.* at 1. The investigators noted one exception: if the case was actually "accepted for criminal prosecution," in which BOP presumably could not continue to protect a federally indicted employee. *See id.* at 1.

[28] *Id.* at 3 (noting BOP has a "general practice of avoiding calling inmates as witnesses"); *Id.* at 1 ("we were told by OIA that, in cases that have not been accepted for criminal prosecution, the BOP will *not* rely on inmate testimony" in misconduct proceedings) (emphasis added).

[29] *Id.* at 1 n.1.

[30] *See* Dept. of Just., *DOJ OIG Releases Management Advisory Memo. of Concerns* (Oct. 13, 2022) (DOJ Press Release).

First Amended Complaint          – 19 –          <span>CONNELLY LAW OFFICES</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

(4) prosecutors federally indicted the employee.[31] (And it wasn't enough that video corroborated testimony; BOP required "video capturing the *act* of misconduct" itself.)[32]

5.64    With those requirements, discipline at BOP was imaginary. Avoiding consequences was easy: BOP staff just needed to commit assaults in the surveillance-camera blind-spots. And BOP staff knew where cameras were missing—the Warden certainly did. (As one of his victims testified during his prosecution, "He told me that—that there was four places that didn't have cameras . . . And he said, 'well, pick which one.'"[33] This is common.[34]) And BOP has been warned about this problem by the Office of Inspector General for years.[35]

5.65    Beyond avoiding cameras, a sexual-predator guard need only deny the allegations. (The chances of "conclusive" forensic evidence, like DNA testing, was hardly an issue.)

5.66    The result, as DOJ predicted, is exactly what happened to A.L. In dismissing victim testimony, BOP knowingly "emboldens miscreant staff members," allowing them to "avoid accountability and remain on staff."[36] The "sexual miscreants" identified by the DOJ

---

[31] *Id.* at 1 ("the BOP will not rely on inmate testimony" in administrative proceedings unless "video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject").

[32] *Id.* at 1.

[33] *U.S. v. Garcia*, No. 21-cv-429-YGR, ECF No. 88 at 23 (N.D. Cal. Nov. 29, 2022) (Trans. at 405:19).

[34] *See, e.g., Herrera v. Akparanta*, No. 20-cv-10206-PKC, ECF No. 52 at 5 (S.D.N.Y. Mar. 27, 2022) (noting BOP guard convicted of sex crimes "repeatedly bringing female inmates to private areas… not monitored by the [prison's] security cameras," taking "advantage of these 'blind spots'"). The DOJ inspector general says the same. *See* Insp. Gen., Michael Horowitz, *Statement to U.S. Senate Comm. on Homeland Security, Permanent Subcomm. on Investigations* at 6 (Dec. 13, 2022) (Horowitz Statement) (noting that officers use "blind spots in camera coverage to sexually and physically assault inmates," citing examples at FCI Lexington and the New York MCC).

[35] *See* Insp. Gen., Michael Horowitz, *Statement to U.S. Senate Comm. on Homeland Security, Permanent Subcomm. on Investigations* at 6 (Dec. 13, 2022) (Horowitz Statement) (noting OIG "has consistently informed the BOP" about the "critical importance" of fixing its "inadequate and outdated camera coverage"—at least since 2016).

[36] *See* Dept. of Just., *DOJ OIG Releases Management Advisory Memo. of Concerns* (Oct. 13, 2022) (DOJ Press Release).

First Amended Complaint                – 20 –               CONNELLY LAW OFFICES
                                                            321 W. 8th Avenue
                                                            Spokane, Washington 99204
                                                            253.593.5100

pose a "serious insider threat" and an obvious "risk of serious harm"[37] to incarcerated women like A.L.[38] By refusing to credit victims and discipline BOP employees, the agency knew women in its care, including A.L., would be sexually abused, but did nothing.[39]

### 3. On paper, BOP requires staff to report suspected sexual abuse and protect inmates from retaliation.

5.67    PREA regulations and BOP policy require prisons to provide multiple avenues for incarcerated women to report sexual abuse, including a method to "privately report sexual abuse," a method to report misconduct to a "public or private entity" outside BOP, including doing so anonymously.[40] And reporting by BOP staff is mandatory: all staff must reports "any knowledge, suspicion, or information" relating to sexual abuse, harassment, or "retaliation against inmates."[41] This is true whether or not the abuse is reported at a different facility.[42]

---

[37] *See* Memo. from Michael Horowitz, Office of Inspector General, to Colette S. Peters, Dir., Fed. Bur. of Prisons at 3 (Oct. 12, 2022) (OIG Report).

[38] BOP denied the practice of refusing to credit victim testimony. The Justice Department noted that BOP's Office of Internal Affairs had asserted the policy "on multiple occasions." Memo. from Michael Horowitz, Office of Inspector General, to Colette S. Peters, Dir., Fed. Bur. of Prisons at 1 n.1 (Oct. 12, 2022) (OIG Report). Given BOP's flip-flop and later claim that the agency "frequently" relied on victim testimony to discipline employees in agency proceedings, the Justice Department asked for a single example—"any cases"—where the agency credited victims without video, an admission, or conclusive forensic evidence. *Id.* at 3 n.2. The BOP was unable to find a single example—ever—of their so-called "frequent" practice of crediting sexual-abuse victims. *Id.*

[39] Given those findings, the Justice Department sensibly recommended the BOP adopt a policy requiring that "the credibility of alleged victims" should be "assessed on an individual basis" rather than discarded "solely based on the person's status" as an inmate. *Id.* at 9. BOP refused, citing union headaches and legal "exposure" for failing to actually abide such a policy.

[40] *See* 28 C.F.R. 115.51(a)–(b)("Inmate reporting").

[41] 28 C.F.R. § 115.61(a) ("Staff and agency reporting duties").

[42] *See* 28 C.F.R. § 115.63 ("Reporting to other confinement facilities").

First Amended Complaint                – 21 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.68    Those reports must be kept confidential: "staff shall not reveal any information" about the report unless for "treatment, investigation," or other valid security or management reason.[43]

5.69    If BOP learns an incarcerated woman like A.L. is at risk, the law requires the agency to act: "When an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate."[44] At the very least, the agency must separate the victim from the accused abuser.[45] There is zero discretion.

5.70    BOP's policies require staff report sexual abuse allegations that happen outside their own facilities. If staff receive a report that an incarcerated person "was sexually abused while confined at another facility," they "shall notify the head of the facility" or other "appropriate office" where the abuse happened—within 72 hours.[46]

5.71    After a victim reports abuse, BOP must prevent retaliation from any source—staff or other inmate.[47] The law requires BOP to actively monitor a victim for no less than three months for behavioral signs of possible retaliation and to provide "emotional support services" to cope with the threat.[48]

5.72    BOP may not throw victims in the SHU to "protect" them from sexually abusive BOP staff. Indeed, the regulations permit solitary confinement only if "there is no available alternative" to protect the victim "from likely abusers."[49] But this is never the case when the abuser is a BOP staff-member—there is always the alternative to suspend the abuser and send them home.

---

[43] *See* 28 C.F.R. § 115.61(b).
[44] 28 C.F.R § 115.62 ("Agency protection duties").
[45] 28 C.F.R. § 115.64(a)(1) (agency "shall be required to . . . [s]eparate the alleged victim and abuser").
[46] 28 C.F.R. § 115.63(a); *see also* BOP Program Statement 5324.12 at 39 (June 4, 2015) (BOP Program Statement).
[47] 28 C.F.R § 115.67(a).
[48] *Id.* § 115.67(a)–(c).
[49] 28 US.C. § 115.43(a).

First Amended Complaint    – 22 –    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

### 4.    In practice, BOP staff fail to report sexual abuse, and they openly retaliate against victims.

5.73    In A.L.'s case, BOP violated virtually every reporting-and-retaliation regulation. Neither her verbal nor written grievances were investigated nor reported to higher officials. This was true not just at FCI Dublin, but also at FCI Waseca, where none of her complaints were referred to the Office of Internal Affairs (let alone within the 72 hours required).[50] Nor was any response made to her written complaint to the Office of Inspector General. And A.L. wasn't released from BOP incarceration until spring 2024—years after her reports.

5.74    BOP took no steps to separate A.L. from Smith, the Warden, or any other perpetrators. There was no monitoring. No emotional support services. Instead, she was threatened with solitary confinement—a terrifying prospect given that other women had been cast into the SHU for months for complaining about sexual abuse.

5.75    Retaliation was so certain that FCI Dublin's clinical director and trauma treatment coordinator, Cynthia Townsend, avoided reporting sexual abuse to protect the victims from retaliation, as she testified at the Warden's criminal trial.[51]

5.76    Violating PREA regulations was, in fact, BOP's standard practice. Special Master Still found "due process violations" occurring "at every level of the disciplinary process," including "incorrect charges" and "excessive sanctions" meted out against the women.[52]

5.77    Retaliation wasn't reserved for people incarcerated. BOP was so committed to protecting itself that it retaliated against staff who reported sexual abuse—including A.L.'s counselor, Ms. Barahona. After A.L. was sent to FCI Waseca, she learned that Ms. Barahona had been demoted for protecting the women—including for entering Mulligan's office to retrieve A.L.'s underwear.

---

[50] *See* 28 U.S.C. § 28 C.F.R. § 115.63(a)–(b).

[51] *See* Lisa Fernandez, *Retaliation is real, FCI Dublin prison psychologist testifies at warden sex trial*, Fox KTVU (Nov. 30, 2022) (Retaliation Article).

[52] Special Master Wendy Still, *First Report of the Special Master* at 10 (June 5, 2024) (Still Report).

First Amended Complaint                    – 23 –                    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.78    Another guard, Officer Tess Korth, reported sexual misconduct by the chaplain and numerous other guards—in writing—to the BOP Office of Internal Affairs for six years, "but was ignored" and then "retaliated against."[53] Rather than investigate sexual misconduct, BOP transferred Officer Korth out of FCI Dublin.

5.79    According to news reports, retaliation continues today. When BOP shuttered FCI Dublin in May, it abruptly transferred the incarcerated women across the country. "Mass chaos," Special Master Still called it.[54] On cross-country bus rides, BOP staff blamed the facility's closure on Dublin women—not on their sexually-abusive colleagues or the failed BOP management. As one woman said, the staff was engaged in "mass retaliation and bullying . . . saying if us women would have shut our mouths . . . [then] we wouldn't be getting shipped and FCI Dublin was closed because of us."[55] Another woman reported that, on the trip to FCI Hazelton, one of the guards said, "we don't need Dublin problems here, let's shoot 'em," at which point multiple officers pulled rifles "and cocked them to scare" the women.[56] Others reported being denied basic necessities like soap, pillows, clean laundry out of spite.[57]

5.80    Needless to say, BOP staff should not punish wards for using the grievance process to report sexual misconduct.

### 5.    On paper, BOP espouses a "zero tolerance" policy for sexual abuse.

5.81    In its written policies, BOP claims it has "zero tolerance" for sexual abuse and sexual harassment—indeed it is the opening sentence of its policy:[58]

---

[53] *See* CBS News, 60 Minutes, *Inside the Bureau of Prisons, a federal agency plagued by understaffing, abuse, disrepair* (June 16, 2024) (CBS Interview).

[54] *See Calif. Coalition for Women Prisoners, et al. v. U.S. Bur. of Prisons, et al.*, No. 23-cv-4155-YGR (N.D. Cal. 2023); Special Master Wendy Still, *First Report of the Special Master* at 8 (June 5, 2024) (Still Report).

[55] Lisa Fernandez, *Feds Closed a Prison Notorious for abuse. Things only got worse*, Garrison Project (June 8, 2024) (Dublin Closure).

[56] *Id.*

[57] *Id.*

[58] BOP Program Statement 5324.12 at 13 (June 4, 2015) (BOP Program Statement). The policy is

First Amended Complaint             – 24 –             CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

P R O G R A M   S T A T E M E N T
OPI:          RSD/PSY
NUMBER:   5324.12
DATE:        June 4, 2015

**Sexually Abusive Behavior Prevention and Intervention Program**

                    /s/
*Approved*:  Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

1.  **PURPOSE AND SCOPE**

To provide a written policy that implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and to provide guidelines to address the following prohibited and/or illegal sexually abusive behavior involving:

- Inmate perpetrator against staff victim.
- Inmate perpetrator against inmate victim.
- Staff perpetrator against inmate victim.

5.82    Through its zero-tolerance policy, BOP intended to ensure that sexual abuse would be detected and the perpetrators, like those running FCI Dublin, would "be disciplined."[59] The policy has little relation to reality.

### 6.    In practice, BOP tolerates widespread sexual abuse and harassment.

5.83    Tolerating widespread sexual abuse and harassment is BOP's practice. No one within BOP investigated A.L.'s claims or took any steps to protect her—not even the Office of Internal Affairs, which exists specifically for that purpose.

5.84    BOP was deliberately indifferent to widespread sexual abuse both at FCI Dublin and nationally, and in fact created a system ensuring misconduct would continue. For example, BOP saw no problem with a detection-and-discipline system that, in 2021, detected nothing at all.

---

required by regulation. *See* 28 C.F.R. § 115.11(a) ("An agency shall have a written policy mandating zero tolerance . . . .").

[59] BOP Program Statement 5324.12 at 13 (June 4, 2015) (BOP Program Statement). The policy is required by regulation.

First Amended Complaint                    – 25 –                    **CONNELLY LAW OFFICES**
                                                                                                                            321 W. 8th Avenue
                                                                                                                            Spokane, Washington 99204
                                                                                                                            253.593.5100

5.85    Indeed, BOP published a report proudly saying so. In 2021, the year A.L. was transferred from Dublin, the agency—employing more than 30,000 employees—found precisely *zero* incidents of staff-on-inmate sexual harassment of any kind anywhere in the nation, as its annual PREA report shows:[60]

> VI.    **Staff-on-Inmate** Incident-Based Assessment: Data for this category is provided in aggregate form in the below table.  Staff incidents are received, assessed, and processed by the Office of Internal Affairs.  Thus, facility security-level is not noted, and only the year-end totals are provided in this report.  During CY2021, **there were no substantiated cases in this category.**

5.86    The report is a fiction. The Warden was indicted in 2021. The agency paid millions of dollars in sexual-abuse settlements to more than a dozen women housed at FCC Coleman, where "[s]ix of eight accused officers admitted to having sexual contact with inmates."[61] (None of the officers were prosecuted—BOP instead allowed them to retire or resign.[62]) It paid over $1 million to three women abused at the M.C.C. in New York.[63]

5.87    The mere fact that BOP found not a single incident in 2021 should have put the agency on notice that its reporting and discipline procedures were not just broken, but non-existent.

5.88    BOP has tolerated sexual abuse for years and refused to adopt policies that would have prevented A.L.'s abuse, as well as the abuse of other women at FCI Dublin. As the Justice Department's Investigator General, Michael Horowitz, told Congress, the agencies know there is a "chronic problem of sexual abuse of inmates in BOP facilities,"[64] and certain policies enable the

---

[60] Bur. of Prisons, *Annual PREA Report, Calendar Year 2021* (Mar. 30, 2022) (PREA Report).
[61] Romy Ellenbogen, *Lawsuit settled in which 15 women alleged sexual abuse at Florida prison*, Tampa Bay Times (May 5, 2021) (Tampa Bay Article).
[62] *Id.*
[63] *Santiago, et al., v. U.S., et al.*, No. 20-cv-6887-SHS, ECF No. 67 (S.D.N.Y. Sept. 24, 2021) (detailing settlement of $1.18 million).
[64] Insp. Gen., Michael Horowitz, *Statement to U.S. Senate Comm. on Homeland Security, Permanent Subcomm. on Investigations* at 4 (Dec. 13, 2022) (Horowitz Statement).

First Amended Complaint                – 26 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

problem. For example, officers use favors and contraband—phones, cigarettes, drugs—to "groom" women and "subsequently assault them."[65] Knowing that pattern, for "nearly 20 years, the Justice Department "repeatedly informed the BOP" that it needed to fix its "staff search policy" as well as "upgrade[] [its] security camera system"—both of which would deter sexual misconduct.[66] And for nearly 20 years, BOP ignored the recommendations.

5.89    In the year A.L. left FCI Dublin, BOP's policy wasn't zero-tolerance; it was zero-interest.

* * *

5.90    Overall, BOP failed to train its staff, knowingly hired and retained staff engaged in sexual misconduct, failed to investigate sexual assaults, and failed to protect incarcerated women, including A.L. It also retaliated against A.L. and other whistleblowers through threats, intimidation, property destruction, and psychological manipulation.

**I.    BOP retaliates after A.L. files suit and speaks to a newspaper reporter.**

5.91    Shortly after A.L. was released to a halfway house in 2024 while under continued BOP authority, she retained undersigned counsel, filed a tort claim, and in September 2024, filed this lawsuit.

5.92    During those months, A.L. worked full-time and served as the manager for her Oxford clean-and-sober house. In this capacity, A.L. routinely met with individuals inside her Oxford house about potentially joining the Oxford sobriety program. These meetings included other women who were FCI Dublin victims, including women who refused to file suit out of fear—even those who had been released from custody.

5.93    BOP, the halfway house, and U.S. Probation knew A.L. was regularly meeting with Oxford house candidates. They also knew these meetings did not go through a pre-approval process—yet no one ever objected or instructed A.L. to obtain pre-approval for these meetings.

---

[65] *Id.* at 4.
[66] *Id.* at 5.

First Amended Complaint                – 27 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.94    After this lawsuit was filed, a local newspaper asked (via counsel) to interview A.L. and publish a story about her experience at FCI Dublin. A.L., believing it important to be an example to other women, agreed, and the article appeared in late September 2024.

5.95    Shortly after the article was published, A.L. was contacted by the halfway house and told she would receive a BOP infraction and potentially be reincarcerated. The reason: the newspaper article.

5.96    A.L. later received a written infraction for failing to obtain pre-approval before someone entered the Oxford house:

First Amended Complaint    – 28 –    CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.97   At the time, A.L., although still under BOP authority, was already working with U.S. Probation (because her supervised release term would soon begin). It was later learned that BOP authorities became aware of the published article, contacted the halfway house, and instructed the halfway house to issue a violation. It was also learned that no one had ever seen BOP issue an instruction like this before—it was unprecedented.

5.98   To intimidate A.L., BOP fabricated grounds for the violation. The basis: the reporter entered the Oxford clean-and-sober house—an unauthorized visit. BOP's evidence was this photo, showing A.L. in the doorway to the home:



5.99   Tellingly, after receiving the infraction, A.L. continued to meet with individuals inside her home who were looking to join the Oxford clean-and-sober program—again, these meetings occurring without any form of pre-approval. BOP knew this, the halfway house knew this, and U.S. Probation knew this—and no one objected.

5.100   So despite A.L. regularly allowing visitors to enter her clean-and-sober house off the streets without pre-approval, the only violation she ever received was when a reporter interviewed her about the abuse she experienced while incarcerated by the BOP at FCI Dublin.

First Amended Complaint          – 29 –          <span style="font-variant: small-caps;">Connelly Law Offices</span>
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

5.101   BOP issued the violation or instructed the violation to chill A.L.'s constitutionally protected speech and to retaliate for filing this lawsuit.

## VI.    Exhaustion

6.1    A.L. has exhausted the administrative requirements of the FTCA.

6.2    While in custody, BOP intimidated and threatened A.L. into silence—despite her repeated written grievances and directly contacting the Office of the Inspector General. There was no available process for an administrative claim.

6.3    When A.L. was finally released from incarceration in May 2024, she diligently worked to secure counsel and file a tort notice. BOP denied A.L.'s claim by written letter received July 16, 2024. And A.L. has filed this Complaint within six months.

## VII.    Claims

7.1    The United States is liable under the FTCA for the operation of the Bureau of Prisons, its acts and omissions, including its supervision, training, policies, practices, and its employees (including their hiring, retention, discipline, training, supervision, and management).

7.2    At all times, the United States and BOP were responsible for operating the federal prisons, including FCI Dublin and later facilities at which A.L. was held.

7.3    At all times discussed above, Defendant Garcia, Defendant Smith, and the other federal employees identified in this First Amended Complaint were acting within the scope of their employment and under color of federal law as correctional officers, law enforcement officers, and federal employees within the meaning of 28 U.S.C. § 2680(h).[67]

7.4    In the acts and omissions described above, Defendants (except Defendant Carla Marie Sisi-Smith) acted under color of law intentionally, recklessly, with gross negligence and deliberate indifference to A.L.'s statutory and constitutional rights, within the scope of their employment (whether under actual authority or apparent authority) and with the consent, ratification, or approval of each other Defendant.

---

[67] *See* 28 U.S.C. § 2680(h).

First Amended Complaint          – 30 –          CONNELLY LAW OFFICES
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

**A.      First Claim: Sexual Assault and Sexual Battery**

7.5      Under the FTCA, the United States is liable for its employees' sexual assaults and batteries against A.L. *See* Calif. Civil Code § 1708.5.[68] As described above, Garcia, Smith, and other BOP employees intended to cause, or with willful disregard for A.L.'s rights caused, harmful and offensive contacts with A.L.'s vagina, groin, buttocks, and breasts, and caused imminent fear of harmful and offensive contacts with A.L.'s vagina, groin, buttocks, and breasts.

7.6      BOP employees  touched A.L. directly and indirectly in a sexually offensive manner.

7.7      In the events described above, A.L. never consented to the touching or being placed in imminent fear of the harmful and offensive contact, and she was harmed and offended by the contact.

7.8      Under the FTCA, A.L. is entitled to recover damages from the United States.

**B.      Second Claim: Assault and Battery**

7.9      In the alternative to sexual assault and battery, under the FTCA, the United States is liable for its employees' assaults and batteries against A.L. *See* Calif. Civil Code § 1708.5.[69] As described above, Garcia, Smith, and other BOP employees intended to cause, or with willful disregard for A.L.'s rights caused, harmful and offensive contacts with A.L. and caused imminent fear of harmful and offensive contacts with A.L.

7.10      BOP's employees touched A.L. directly and indirectly in an offensive and harmful manner.

7.11      In the events described above, A.L. never consented to the touching or being placed in imminent fear of the harmful and offensive contact, and she was harmed and offended by the contact.

7.12      Under the FTCA, A.L. is entitled to recover damages from the United States.

---

[68] *See* Calif. Civil J. Instr. § 1708.5.
[69] *See* Calif. Civil J. Instr. § 1708.5.

First Amended Complaint                    – 31 –                    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

### C.   Third Claim: Intentional Infliction of Emotional Distress

7.13   Under the FTCA, the United States is liable for its employees' intentional infliction of emotional distress against A.L.[70] As described above, BOP employees intentionally or with reckless disregard engaged in conduct beyond all possible bounds of decency that any reasonable person would regard as intolerable in a civilized community.

7.14   BOP employees abused their positions of authority over A.L., including employees acting as warden, guard, counselor, manager, and as other BOP staff members, all of whom had real or apparent power to affect A.L.'s liberty, property, and other interests.

7.15   These employees knew A.L. was vulnerable to emotional distress due to her personal history of abuse, trauma, and addiction, and as an incarcerated person who was subject to administrative discipline, solitary confinement, loss of good-time credits, loss of First Step Act credits, loss of prison jobs, loss of property, loss of dignity, and other prison privileges. BOP's employees intended that their conduct would cause severe mental distress and harm or acted with reckless disregard that their conduct would do so.

7.16   Under the FTCA, A.L. is entitled to recover damages from the United States.

### D.   Fourth Claim: False Imprisonment

7.17   Under the FTCA, the United States is liable for Officer Darrell Smith's false imprisonment of A.L.[71] As described above, Officer Smith, acting within the scope of employment, wrongfully restrained, confined, and detained A.L. against her will. Officer Smith intentionally deprived A.L. of her freedom of movement by threats and by force, i.e., pinning her to a wall while he sexually assaulted her. As Smith did so, A.L. was unable to move for approximately 10 minutes.

7.18   Officer Smith did not hold a lawful privilege to confine A.L. in the manner and for the purposes that he did.

7.19   At no point did A.L. consent to Officer Smith's conduct.

---

[70] This claim falls under California common law. *See* Calif. Civil J. Instr. § 1600.

[71] This claim falls under California common law. *See* Calif. Civil J. Instr. § 1400.

First Amended Complaint                    – 32 –                    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

7.20    As described above, A.L. was harmed by the confinement both physically and mentally.

7.21    Under the FTCA, A.L. is entitled to recover damages from the United States.

**E.    Fifth Claim: Sexual Harassment**

7.22    Under the FTCA, the United States is liable for its employees' sexual harassment of A.L., all in violation of California Civil Code § 51.9. As described above, BOP held a special relationship with A.L., controlling every aspect of her life. At the same time, BOP employees made sexual advances, solicitations, sexual requests, demands for sexual compliance, and engaged in other verbal and physical conduct of a sexual nature and a hostile nature.

7.23    That conduct was based on A.L.'s gender and was unwelcome, pervasive, and severe.

7.24    As a result, A.L. was personally injured, emotionally distressed, and was denied statutory and constitutional rights (as outlined above and below in this Complaint). She has and will continue to suffer economic loss resulting from the sexual harassment and resulting trauma.

7.25    Under the FTCA, A.L. is entitled to recover damages from the United States.

**F.    Sixth Claim: Intentional Interference with Civil Rights by Threats, Intimidation, or Coercion**

7.26    Under the FTCA, the United States is liable for its employees' intentional interference with A.L.'s civil rights by threats, intimidation, or coercion, all in violation of California Civil Code § 52.1.

7.27    As described above, BOP employees intentionally threatened, intimidated, and coerced A.L. for exercising both federal and state rights. BOP employees threatened, intimidated, and coerced A.L. from filing grievances under the Prison Litigation Reform Act ("PLRA"), which a plaintiff must exhaust before filing a civil suit, attempting to prevent A.L. from pursuing her civil rights under the FTCA and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). That is, BOP employees threatened, intimidated, and coerced A.L. for exercising and to prevent her from exercising her rights under those statutes. Additionally, BOP employees threatened,

intimidated, and coerced A.L. for exercising and attempting to exercise rights secured by the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.*, and her rights under California law, including her general personal rights to protection from bodily restraint and harm under California Civil Code § 43, and her right to be free from sexual battery under California Civil Code § 1708.5.

7.28    A.L. reasonably believed that if she exercised her statutory civil rights, BOP employees would commit violence against her or her property.

7.29    That belief was reasonable given A.L. watched BOP employees destroy her and other incarcerated women's property and had been sexually assaulted herself by BOP employees who possessed the apparent and actual ability to carry out their threats. A.L. was threatened, intimidated, and coerced to not report sexual battery, sexual harassment, or any other mistreatment at BOP employees' hands and prevented from filing grievances and punished after doing so.

7.30    Under the FTCA, A.L. is entitled to recover damages from the United States.

**G.    Seventh Claim: Invasion of Privacy**

7.31    Under the FTCA, the United States is liable for its employees' invasion of privacy under California law.

7.32    Despite being held in prison, A.L. maintained a reasonable expectation of privacy in her own body. As described above, BOP employees intentionally intruded on her reasonable expectation of privacy in a manner that would be highly offensive to a reasonable person in the same position when they sexually abused and harassed her.

7.33    In doing so, the BOP employees sought to sexually gratify themselves, humiliate and intimidate A.L., and fulfill other illicit goals—none of which served valid penological purposes.

7.34    As a result, A.L. was physically and emotionally harmed.

7.35    Under the FTCA, A.L. is entitled to recover damages from the United States.

First Amended Complaint                – 34 –                **CONNELLY LAW OFFICES**
                                                             321 W. 8th Avenue
                                                             Spokane, Washington 99204
                                                             253.593.5100

**H.     Eighth Claim: Negligence**

7.36    Under the FTCA, the United States is liable for its employees' negligence under California law.

7.37    As described above, Defendants owed a custodial duty to protect A.L. from foreseeable harm, including sexual abuse, harassment, retaliation, negligent infliction of emotional distress and the other harms identified in this Complaint. Defendants owed a general duty of care to A.L. to act as a reasonable person would under similar circumstances.

7.38    The duty is mandated by common law, federal law, by statute under PREA, and by numerous binding regulations and cannot be delegated.

7.39    As described above, Defendants breached their duty of care by failing to supervise and operate FCI Dublin, including by allowing widespread sexual abuse, harassment, and retaliation by its employees. Defendants failed to train, retain, supervise, monitor, investigate, and discipline BOP staff to prevent sexual abuse, harassment, and retaliation.

7.40    As described above, the United States and its employees knew or should have known A.L. was subjected to sexual abuse, harassment, retaliation, and emotional distress and failed to act.

7.41    Defendants possessed no discretion to ignore its employees' criminal and tortious conduct.

7.42    A reasonable prison administrator would comply with PREA regulations.

7.43    A reasonable prison administrator must investigate all claims of sexual abuse and harassment.

7.44    A reasonable prison administrator must ensure that if incarcerated women report sexual abuse, harassment, and retaliation by prison staff, they are separated from their alleged abusers.

7.45    A reasonable prison administrator must ensure that incarcerated women can confidentially report sexual abuse, harassment, and retaliation.

First Amended Complaint                    – 35 –                    CONNELLY LAW OFFICES
                                                                     321 W. 8th Avenue
                                                                     Spokane, Washington 99204
                                                                     253.593.5100

7.46    A reasonable prison administrator must ensure that staff committing sexual abuse, harassment, or retaliation are promptly disciplined.

7.47    A reasonable prison administrator would know that an internal investigation and disciplinary system that substantiated not a single incident of staff-on-inmate sexual abuse for an entire year was broken.

7.48    If a prison official failed to comply with PREA regulations, it is foreseeable that incarcerated women, like A.L., would be sexually abused, harassed, and retaliated against.

7.49    The United States is liable for its employees' negligent infliction of emotional distress against A.L.

7.50    As described above, Defendants acted negligently, causing serious and severe emotional distress.

7.51    Defendants engaged in conduct beyond all possible bounds of decency that any reasonable person would regard as intolerable in a civilized community.

7.52    Defendants abused their positions of authority over A.L., including employees acting as warden, guard, counselor, manager, and as other BOP staff members, all of whom had real or apparent power to affect A.L.'s liberty, property, and other interests.

7.53    Defendants also caused emotional distress to A.L. by allowing widespread sexual abuse, harassment, and retaliation by its employees. Defendants failed to train, retain, supervise, monitor, investigate, and discipline BOP staff to prevent sexual abuse, harassment, and retaliation.

7.54    Defendants knew A.L. was vulnerable to emotional distress due to her personal history of abuse, trauma, and addiction, and as an incarcerated person who was subject to administrative discipline, solitary confinement, loss of good-time credits, loss of First Step Act credits, loss of prison jobs, loss of property, loss of dignity, and other prison privileges. BOP's employees intended that their conduct would cause severe mental distress and harm or acted with reckless disregard that their conduct would do so.

First Amended Complaint                – 36 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

7.55    As a result of Defendants' conduct, A.L. suffered severe distress, anxiety, fear, humiliation, shame, depression, PTSD, loss of quality of life and dignity, and medical and economic injuries.

7.56    As described above, each of the Defendants is liable for the acts and omissions regarding their treatment of A.L.

7.57    Under the FTCA, A.L. is entitled to recover damages from the United States.

## I.    Ninth Claim: Sex Trafficking

7.58    Defendants Garcia and Smith are liable for violating 18 U.S.C. § 1591(a). Under the Trafficking Victims Protection Act (TVPA),[72] Congress created a civil cause of action for against anyone who solicits a victim while knowing that force, threats, or coercion will be used to cause the person to engage in a sexual act "on account of which anything of value is given to or received by any person."[73]

7.59    The statute is broad. Courts have found that a "sex act" isn't the narrow term used in other criminal statutes; the term carries the common dictionary meaning: "an act performed with another for sexual gratification." *U.S. v. Bazar*, 747 F. App'x 454, 456 (9th Cir. 2018); *see also U.S. v. Taylor*, 44 F.4th 779, 789 (8th Cir. 2022), cert. denied, 143 S. Ct. 843 (2023) (holding term "sex act" relies on "ordinary and nature meaning" rather than narrower definition in 18 U.S.C. § 2246)). Thus, acts like sexual groping of the breasts, buttocks, and vagina fall within its meaning.

7.60    In the same vein, courts have interpreted the word "value" more broadly than just money. *Doe v. Knight*, 624 F. Supp. 3d 857, 863 (E.D. Mich. 2022) (citations omitted). Congress used "expansive language in defining commercial sex act[s]," and the plain text "requires a liberal reading." *Id.* (citing *U.S. v. Maneri*, 353 F.3d 165, 168 (2d Cir. 2003)). Thus, TVPA includes coercive promises "such as career advancement" in exchange for sexual activity within its scope.

---

[72] *See* 18 U.S.C. § 1581 *et seq.*

[73] *See* 18 U.S.C. § 1591(a)(2), (e)(3); *see also* 18 U.S.C. § 1595(a) (creating private right of action).

First Amended Complaint                – 37 –                **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

7.61    As described above, Defendants Garcia and Smith forced A.L. into sex acts through both force, threats, and coercion in exchange for things of value.

7.62    Officer Smith told A.L. she could keep her property if she refrained from resisting his sexual assault, and then he forcibly pinned her to a wall while assaulting her.

7.63    Warden Garcia used the inherently coercive nature of prison and his control over her housing and privileges, including obtaining paying prison jobs, in exchange for A.L. allowing his sexual groping.

7.64    As described above, their acts were part of a repeated scheme by BOP employees to coerce or force sexual acts by women at FCI Dublin. And their acts resulted in serious harm and physical restraint, including physical, psychological, emotional, financial, and reputational harm.

7.65    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

### J.    Tenth Claim: Obstruction

7.66    Defendant Garcia is liable for violating 18 U.S.C. § 1591(d) by obstructing, attempting to obstruct, or interfering with enforcement of the TVPA.

7.67    Defendant engaged in a scheme, plan, and pattern to intimidate A.L. and other women at FCI Dublin not to report sexual trafficking.

7.68    Warden Garcia selected staff with the intent that sexual trafficking would continue unabated. He ignored his mandatory reporting and investigation duties under PREA and BOP polices related to sexual assaults and harassment against A.L. and numerous other women.

7.69    As a result, BOP employees unlawfully threatened to place A.L. in the SHU to prevent her from reporting sexual abuse, confiscated and destroyed A.L.'s property to punish her for reporting and to deter further reporting, threatened A.L., and performed other acts described above designed to punish and deter reporting of the sexual abuse at FCI Dublin.

First Amended Complaint    – 38 –    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

7.70    Defendants' obstruction resulted in serious harm, including physical, psychological, emotional, financial, and reputational harm.

7.71    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendants' wrongful conduct.

**K.    Eleventh Claim: Conspiracy to Sex Traffick**

7.72    The individual Defendants are liable under 18 U.S.C. § 1594(b)–(c) for conspiring to commit sex trafficking and obstruction.

7.73    As described above, the individual Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, or conspired to maintain and continue the widespread sex trafficking and obstruction at FCI Dublin, including sex trafficking A.L. and obstructing her reporting efforts.

7.74    As described above, the individual Defendants committed numerous overt acts furthering the conspiracy. They solicited, received, or attempted to receive sexual acts in exchange for valuable things, including property, jobs, and other prison privileges. Defendants retaliated against and intimidated A.L. and other women through express threats, destruction of property, cell searches, and knowingly refused to investigate and report criminal sexual abuse as required by PREA and mandatory regulations.

7.75    Defendants knew or should have known that their acts supported and facilitated a trafficking venture.

7.76    As a result of the individual Defendants' conspiracy, A.L. suffered serious harm, including physical, psychological, emotional, financial, and reputational harm.

7.77    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendants' wrongful conduct.

**L.    Twelfth Claim: Cruel and Unusual Punishment**

7.78    While the Constitution doesn't mandate "comfortable prisons, neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Inhumanity is precisely

what Defendants Garcia and Smith inflicted on A.L., and they are liable for violating the Eighth Amendment under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).[74]

7.79   As described above, Warden Garcia and Officer Smith denied A.L. humane conditions of confinement. By sexually abusing and harassing A.L., Garcia and Smith both knew A.L. had been or would be seriously harmed, or at the very least were aware of facts and actually inferred a substantial risk of serious harm. Despite their awareness, Garcia and Smith actively caused harm or were deliberately indifferent to the harm.

7.80   As a result, A.L. suffered serious harm, including physical, psychological, emotional, financial, and reputational harm for which Garcia and Smith are liable for damages.

## VIII.   Jury Demand

8.1   A.L. respectfully demands a jury trial on all triable issues involving the individual Defendants.

## IX.   Relief Requested

9.1   A.L. respectfully requests the following relief: (1) an award of compensatory damages (both economic and noneconomic) against the United States in amounts to be proven and determined at trial; (2) compensatory and punitive damages against the individual defendants; (3) reasonable attorneys' fees and litigation expenses under 42 U.S.C. §§ 1988, 12205, against the individual defendants; and (4) other relief the Court deems proper.

---

[74] *See also Carlson v. Green*, 446 U.S. 14 (1980) (FTCA and *Bivens* exist as parallel claims); *Farmer v. Brennan*, 511 U.S. 825 (1994) (permitting claim against BOP officials for "a deliberately indifferent failure to protect petition's safety" from sexual assault).

First Amended Complaint                           – 40 –                           **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

Dated: January 7, 2026.

Connelly Law Offices, PLLC
Attorneys for Plaintiff A.L.

_____
John B. McEntire, IV, Wash. Bar. No. 39469
Colin G. Prince, Wash. Bar. No. 43166
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100
Admitted *Pro Hac Vice*

s/ Davina Chen
Davina T. Chen, Calif. Bar. No. 202272

## Service Certificate

I certify that, on January 7, 2026, I took the following steps: 1) I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify counsel for the United States; 2) I initiated personal service of this First Amended Complaint on *pro se* Defendant Darrell Smith at his address registered in ECF; and 3) I initiated service of this First Amended Complaint on Defendant Ray Garcia through Kevin Little, his attorney.

s/John B. McEntire, IV
John B. McEntire, Wash. Bar. No. 39469
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100

First Amended Complaint                    – 41 –                    **CONNELLY LAW OFFICES**
321 W. 8th Avenue
Spokane, Washington 99204
253.593.5100